Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| FERNANDO LUIS SOTO ROBERT, CRISTÓBAL SOTO ROBERT, WANDA ROBERT COLÓN Y LEONARDO SOTO SANTOS<br><br>Apelados<br><br>V.<br><br>IVÁN GONZÁLEZ PIZARRO, PETRONILA RUIZ VELÁZQUEZ Y LA SOCIEDAD LEGAL DE GANANCIALES POR ELLOS COMPUESTA; COMPAÑÍAS DE SEGURO X, Y, Z; Y SUTANOS DE TAL X, Y, Z<br><br>Apelantes | KLAN202300644 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Salinas<br><br>Caso Núm.: SA2019CV00113<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidente; el Juez Rivera Colón, la Juez Lebrón Nieves y el Juez Rodríguez Flores

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 24 de mayo de 2024.

El 24 de julio de 2023, compareció ante este Tribunal de Apelaciones, Iván González Pizarro, su esposa Petronila Ruiz Velázquez[1] y la Sociedad Legal de Gananciales compuesta por ambos (en adelante y en conjunto, los apelantes). Por medio de esta, solicitan la revisión de la *Resolución* emitida el 21 de junio de 2023, y notificada el 22 de junio de 2023, por el Tribunal de Primera Instancia, Sala Superior de Salinas. En virtud del aludido dictamen, el foro de instancia declaró No Ha Lugar la *Urgente Moción de*

---

[1] El 25 de febrero de 2020, el Tribunal de Primera Instancia declaró Con Lugar una solicitud para presentar demanda enmendada, instada el 22 de enero de 2022, a los fines de sustituir el nombre ficticio de *fulana de tal*, por el de la señora Petronila Ruíz Velázquez. Véase entradas número 48 y 50 del expediente electrónico en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

Número Identificador

SEN2024 _____

*Reconsideración; Moción de Enmiendas o Determinaciones Iniciales o Adiciones*, presentada por los apelantes.

Adelantamos que, por los fundamentos que expondremos a continuación, confirmamos la *Resolución* recurrida.

**I**

Los hechos que dan inicio a la controversia de epígrafe son los que en adelante se esbozan.

El 1 de abril de 2019, Fernando Luis Soto Robert, Cristóbal Soto Robert, Wanda Roberto Colón y Leonardo Soto Santos (en adelante y en conjunto, los apelados), presentaron *Demanda* sobre daños y perjuicios contra los apelantes.[2] Por medio de esta, los apelados esgrimieron que, el señor Fernando Luis Soto Robert (en adelante, señor Soto Robert), trabajaba en un taller dedicado a la elaboración de equipo en *stainless steel*, llamado G&G Welding Shop localizado en el pueblo de Cidra. Allí, el señor Soto Robert fungía como ayudante general, y estaba bajo la supervisión inmediata del señor Iván González Pizarro (en adelante, señor González Pizarro). Su horario regular era de lunes a viernes, de 8:00 de la mañana a 5:00 de la tarde.

Esgrimieron que, el lunes, 2 de abril de 2018, el señor Soto Robert se encontraba en su lugar de trabajo, y a eso de las 4:00 de la tarde, el señor González Pizarro le indicó que irían a Salinas a encender y probar los motores de una embarcación, ubicada en una guardería de dicho municipio. Precisaron que, la referida embarcación era propiedad de los apelantes.

Los señores Soto Robert y González Pizarro llegaron a la guardería en Salinas entre las 4:30 y las 4:40 de la tarde. Estando ya en la embarcación, el señor Soto Robert se posicionó en el área de los motores, mientras que el señor González Pizarro se

---

[2] Apéndice del recurso de apelación, págs. 29-33.

encontraba en el segundo piso, donde ubicaba el timón de la embarcación. De entrada, el señor González Pizarro intentó encender la embarcación sin éxito. Ante ello, el señor Soto Robert le echó gasolina a la misma y, al hacerlo, le indicó al señor González Pizarro que el motor de la embarcación se encontraba "inundado".[3] No obstante, el señor González Pizarro le indicó que seguiría intentando encender la embarcación, y así lo hizo. Mientras el señor Soto Robert aún se encontraba entre medio de los motores, el señor González Pizarro intentó nuevamente encender la embarcación y en ese instante, el motor explotó, ocasionando un incendio.

Como resultado de ello, el señor Soto Robert recibió quemaduras de segundo grado en varias partes de su cuerpo. En tales condiciones, el señor Soto Robert abandonó la guardería y condujo hasta una institución hospitalaria en el municipio de Cayey, donde lo esperaba su hermano, el señor Cristóbal Soto Robert. Allí le ofrecieron los primeros auxilios, y posteriormente, lo refirieron al Centro-Médico de Río Piedras, donde permaneció hospitalizado por varios días. Durante dicho periodo de tiempo, el señor Soto Robert estuvo asistido por su hermano, el señor Cristóbal Soto Robert, y su madre, la señora Wanda Robert Colón.

A raíz de todo lo anterior, los apelados reclamaron: (i) una partida superior a $75,000.00, por los daños físicos, morales y las angustias mentales sufridas por el señor Soto Robert; (ii) una suma superior a $25,000.00, en concepto de la pérdida económica del señor Soto Robert, al verse obligado a entregar su vehículo de motor al banco, puesto que las quemaduras le imposibilitaban trabajar; (iii) una partida de lucro cesante no menor de $14,300.00; (iv) la suma en exceso de $50,000.00 por los daños morales sufridos por sus padres; (v) una partida superior a $10,000.00 por las angustias

---

[3] *Íd.*, pág. 30.

mentales sufridas por su hermano y, (vi) una suma no menor de $1,000.00 por los gastos relacionados al proceso de hospitalización y recuperación, para una suma total de $175,300.00.

El 25 de junio de 2019, los apelantes presentaron una *Moción Solicitando Desestimación de la Demanda al Amparo de la Regla 10.2 de Procedimiento Civil*.[4] A grandes rasgos, arguyeron que, las alegaciones esbozadas en la *Demanda* habían sido presentadas en un proceso administrativo ante la Corporación del Fondo del Seguro del Estado (CFSE), por lo que los apelados debían agotar los remedios ante la agencia antes de acudir al foro judicial. Añadieron que, el patrono del señor Soto Robert contaba con un póliza para el año fiscal 2017-2018, por lo que le cobijaba la inmunidad patronal.

El 16 de julio de 2019, los apelados se opusieron mediante *Oposición a "Moción Solicitando Desestimación de la Demanda al Amparo de la Regla 10.2 de Procedimiento Civil"*.[5] En esencia, adujeron que, al señor González Pizarro no le aplicaba la doctrina de inmunidad patronal. Manifestaron que, el trámite ante la agencia administrativa fue iniciado por el señor Iván González Ruiz, hijo del señor González Pizarro y dueño de G&G Welding Shop. Alegaron que, era precisamente el señor Iván González Ruiz quien mantenía una póliza vigente con la CFSE, y no el señor González Pizarro. Por otro lado, precisaron que, no existía un nexo causal entre las lesiones sufridas por el señor Soto Robert y sus labores en G&G Welding Shop. Finalmente, expresaron que la moción de los apelantes debía considerarse como una solicitud de sentencia sumaria y, que al existir una controversia real de hechos, la misma debía declararse No Ha Lugar.

Evaluados los escritos de las partes, el foro de instancia dictó *Sentencia* el 18 de julio de 2019, notificada al día siguiente,

---

[4] *Íd.*, págs. 34-41.
[5] *Íd.*, págs. 42-48.

declarando Ha Lugar la moción dispositiva.[6] En desacuerdo, el 5 de agosto de 2019, los apelados presentaron *Solicitud de Reconsideración de Sentencia Dictada el 18 de julio de 2019*. De entrada, insistieron en que, la moción de desestimación presentada por los apelantes debía considerarse como una solicitud de sentencia sumaria, y el foro de instancia debía ordenar el cumplimiento de los requisitos que exige la Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V., R. 36. Subrayaron que, existía controversia sobre hechos materiales. Por otro lado, se reafirmaron en que la doctrina de inmunidad patronal no era de aplicación en el caso, en vista de que el accidente no había estado relacionado a las funciones laborales del señor Soto Robert.

El 8 de agosto de 2019, notificada el día siguiente, el Tribunal de Primera Instancia dictó *Resolución*, declarando Con Lugar la solicitud de reconsideración, bajo el fundamento de que la moción de desestimación presentada por los apelantes no cumplía con la Regla 36 de las de Procedimiento Civil, *supra*.[7]

Así las cosas, el 17 de septiembre de 2019, los apelantes presentaron *Contestación a Demanda*.[8] En esencia, negaron la mayoría de las alegaciones. Sobre el horario de trabajo del señor Soto Robert, adujeron que el mismo era uno flexible. Así mismo, sostuvieron que, el día del accidente, el señor Soto Robert se encontraba en la embarcación asistiendo al señor González Pizarro "en trabajos conducentes a la toma de medidas para la construcción e instalación de un tope de "Stainless Steel", entre otras instrucciones dadas por el [señor] Iván González Ruiz."[9]

Entre sus defensas afirmativas, los apelantes esgrimieron que, los actos propios del señor Soto Robert afectaron su condición

---

[6] *Íd.*, págs. 49-53.
[7] *Íd.*, pág. 63.
[8] *Íd.*, págs. 64-74.
[9] *Íd.*, pág. 66.

de salud, al rechazar y no continuar con el tratamiento provisto por la CFSE. En adición, arguyeron nuevamente que, el señor Soto Robert no agotó los remedios administrativos ante la CFSE, y que procedía la doctrina de inmunidad patronal.

Tras múltiples trámites procesales, innecesarios pormenorizar, el 20 de septiembre de 2021, los apelantes presentaron *Solicitud de Sentencia Sumaria*.[10] En virtud de esta, insistieron en que los hechos ocurridos estaban relacionados al empleo del señor Soto Robert, por lo que le aplicaba la doctrina de inmunidad patronal. Precisaron que, las funciones del señor Soto Robert incluían el asistir a su patrono en distintas tareas de servicio y mantenimiento, y que los hechos ocurrieron dentro del horario de trabajo.

Tras una prórroga concedida[11], el 20 de octubre de 2021, los apelados se opusieron a la referida solicitud mediante *Oposición a Moción de Sentencia Sumaria*.[12] De entrada, arguyeron que, la solicitud de sentencia sumaria no cumplía con los requisitos de la Regla 36.3 de las de Procedimiento Civil. 32 LPRA Ap. V, R. 36.3. De otro lado, sostuvieron que, los eventos ocurridos que dieron paso a la presentación de la *Demanda* no estaban relacionados a un accidente laboral o a las funciones inherentes del señor Soto Robert en su trabajo.[13] Expresaron que, el accidente ocurrió como consecuencia de la negligencia del señor González Pizarro. Añadieron que, el señor González Pizarro no contaba con una póliza vigente con la CFSE, por lo que no aplicaba la doctrina de inmunidad patronal, ni tampoco la de agotamiento de remedios administrativos. Por último, reiteraron que, la persona que inició

---

[10] Apéndice del Alegato en Oposición de los apelados, págs. 1-41.
[11] Véase entradas número 98 y 99 del expediente electrónico en el SUMAC.
[12] Apéndice del Alegato en Oposición de los apelados, págs. 42-82.
[13] *Íd.*, pág. 49.

los trámites ante la CFSE, fue el señor Iván González Ruiz y no el señor Soto Robert, como alegaron los apelantes en su solicitud.

Posteriormente, el 22 de noviembre de 2021, y notificada el 29 de noviembre de 2021, el foro de instancia emitió *Resolución*, declarando Sin Lugar la solicitud de sentencia sumaria.[14] Precisa destacar que, mediante dicha *Resolución*, el foro *a quo* consignó un total de 19 hechos que no se encontraban en controversia, y 8 que sí estaban controvertidos.

Insatisfechos, tanto los apelantes como los apelados presentaron solicitudes de reconsideración. Por su parte, el 2 de diciembre de 2021, los apelados presentaron *Solicitud de Reconsideración de Resolución en Cuanto a las Determinaciones de Hechos y/o Enmienda*.[15] Mientras, el 14 de diciembre de 2021, los apelantes presentaron *Urgente Moción Solicitando Reconsideración*.[16] No obstante, el 25 de enero de 2022, el foro de instancia dictó *Resolución* declarando Sin Lugar ambas solicitudes.[17]

Aún inconformes, el 23 de febrero de 2022, los apelantes presentaron un recurso de *Certiorari* ante esta segunda instancia judicial, mas, el mismo fue denegado por este mismo Panel, mediante *Resolución* emitida el 22 de abril de 2022.[18]

Así las cosas, y tras otros varios trámites procesales, el juicio en su fondo fue celebrado los días 24 y 25 de enero de 2023, y el 21 de febrero de 2023. En su primer día, testificó el señor Soto Robert.[19] En el segundo día, continuó testificando el señor Soto

---

[14] La referida *Resolución* fue enmendada por primera vez el 1 de febrero de 2022, y posteriormente el 22 de abril de 2022. La segunda enmienda fue realizada a los fines de aclarar hechos que no estaban en controversia y de corregir una fecha. Véase, entradas número 105, 127 y 144 del expediente electrónico en el SUMAC.

[15] Véase entrada número 106 del expediente electrónico en el SUMAC.

[16] Véase entrada número 119 del expediente electrónico en el SUMAC.

[17] Véase entrada número 127 del expediente electrónico en el SUMAC.

[18] Véase *Resolución* emitida el 22 de abril de 2022 bajo el caso con designación alfanumérica KLCE202200200.

[19] Transcripción de la Prueba Oral, del 24 de enero de 2023, págs. 26-147.

Robert[20], y luego prestaron testimonio los señores Cristóbal Soto Robert[21] y Leonardo Soto Santos[22], y la señora Wanda Ivette Robert Colón[23]. Finalmente, en el tercer día testificaron los señores González Pizarro e Iván González Ruiz.[24]

Aquilatada la prueba testifical y documental presentada por las partes, el tribunal *a quo* dictó *Sentencia* el 4 de abril de 2023, declarando Ha Lugar la *Demanda* instada por los apelados.[25] El foro primario emitió las siguientes determinaciones de hechos:

**A. Según la "Resolución Nunc Pro Tunc" del 22 de abril de 2022, los hechos 1 al 19 no están en controversia:**

1. Para el día 2 de abril de 2018, el codemandado Iván González Pizarro era dueño de embarcación marca Viking, de nombre "Teté", que se encontraba en una guardería de Salinas.

2. El día 2 de abril de 2018, el codemandado Iván González Pizarro le solicitó al codemandante Fernando L. Soto Robert que lo acompañara a Salinas para prender su embarcación y probar los motores.

3. El día 2 de abril de 2018, Fernando L. Soto Robert e Iván González Pizarro salieron para Salinas en el vehículo de motor propiedad de Fernando.

4. El día 2 de abril de 2018, Fernando L. Soto Robert e Iván González Pizarro llevaron envases para echar gasolina en el vehículo de motor de Fernando.

5. El día 2 de abril de 2018 antes de llegar al lugar donde se encontraba la embarcación en Salinas, Fernando L. Soto Robert e Iván González Pizarro se detuvieron en una estación de gasolina para rellenar los envases para gasolina que tenían.

6. El día 2 de abril de 2018, cuando Don Iván y Fernando llegaron a la guardería de Salinas donde estaba la embarcación de Don Iván, rápidamente procedieron a bajar los envases para gasolina y echarles gasolina a los tanques de la embarcación.

---

[20] Transcripción de la Prueba Oral, del 25 de enero de 2023, págs. 6-32.
[21] *Íd.*, págs. 35-70.
[22] *Íd.*, págs. 72-88.
[23] *Íd.*, págs. 89-104.
[24] Transcripción de la Prueba Oral, del 21 de febrero de 2023, págs. 7-93 y 94-174, respectivamente.
[25] Apéndice del recurso de apelación, págs. 10-28.

7.  El día 2 de abril de 2018, la embarcación propiedad de los codemandados, Iván González Pizarro y su esposa Petronila Ruiz Velázquez, se incendió y quemó en su totalidad.

8.  La embarcación de los codemandados se incendió cuando el codemandado Iván González Pizarro intentaba prender los motores de ésta.

9.  El codemandante Fernando sufrió daños como consecuencia de la explosión que provocó el incendio de la embarcación.

10. Como consecuencia del incendio en la embarcación, el codemandante Fernando estuvo hospitalizado en el Centro Médico de Río Piedras.

11. El horario de trabajo del codemandante Fernando cuando trabajaba en el taller GG Welding Shop era uno flexible.

12. Las labores de Fernando en su trabajo eran asistir a los empleados de GG Welding Shop con los cortes y cortaduras de metales.

13. El Sr. Iván González Ruiz (testigo de los codemandados) no utilizaba la embarcación para llevar clientes; sólo llevaba amigos.

14. Iván González DBA GG WELDING era un patrono asegurado bajo la CFSE para la fecha en el *sic* que ocurrió el accidente alegado en la demanda, bajo la póliza 07-1-81-00033, año fiscal 2017-2018.

15. La póliza patronal de Iván González DBA GG WELDING con la CFSE se expidió bajo los siguientes riesgos: "3631-180 – undiciones, herrería y Machine Shop; 8813-350 – Patrono Construcción; 9402-371 – Limpieza de calle, recogido de basura y otros desperdicios".

16. Las localidades para la cual la Corporación del Fondo del Seguro del Estado ("CFSE") expidió la póliza a nombre de Iván González DBA GG WELDING es: Bo. Arenas, Sector Campo Bello KM 6.3, [Cidra], PR 00739.

17. Se presentó ante la CFSE una solicitud de servicios en beneficio del demandante Fernando L. Soto Robert bajo la póliza del codemandado Iván González DBA GG WELDING que a su vez presentó ante el CFSE y que dicha reclamación fue cerrada el 13 de junio de 2018, por falta de interés del demandante Fernando L. Soto Robert. No obstante, surge de su testimonio vertido en el juicio que el codemandado Iván González Pizarro no tenía póliza con el Fondo del Seguro del Estado ni cubierta de seguros

alguna que respondiera por los daños del presente caso.

18. El 17 de abril de 2018, Iván González DBA GG WELDING refirió al CFSE un informe patronal sobre un accidente de trabajo sufrido por el demandante Fernando L. Soto Robert.

19. Que Iván González DBA GG WELDING, para la fecha del accidente era el patrono del demandante Fernando L. Soto Robert.

**B. La prueba testifical y documental presentada durante el juicio demostró lo siguiente:**

20. Para el 2 de abril de 2018, el codemandante Fernando trabajaba para "GG Welding Shop" y llevaba alrededor de 3 años trabajando en ese lugar.

21. En "GG Welding Shop" a Fernando le pagaban $275.00 semanal en efectivo. No le descontaban en nómina, ni aportaciones al Seguro Social, Medicare, o retención del Departamento de Hacienda. Según declarado por testigo, Iván González Ruiz, Fernando trabajaba "por debajo de la mesa".

22. Fernando no tenía contrato de empleo con "GG Welding Shop".

23. El jefe o patrono del codemandante Fernando era el Sr. Iván González Ruiz.

24. La compañía "GG Welding Shop" le pertenece al Sr. Iván González Ruiz, hijo de los codemandados, y es su único dueño.

25. La compañía "GG Welding Shop" es un "D/B/A" y opera bajo el seguro social del Sr. Iván González Ruiz; no está incorporada.

26. Declaró el codemandado Iván González Pizarro que la compañía "GG Welding Shop" es propiedad de su hijo, Iván González Ruiz.

27. Declaró el testigo, Sr. Iván González Ruiz, que la compañía "GG Welding Shop" se dedica a hacer tanques de diésel para generadores eléctricos, dar mantenimiento a los generadores eléctricos y hacer soldaduras y trabajos en Stainless Steel para Caribbean Restaurants, Burger King y distintas compañías. No se dedica a mecánica de motores o mecánica de botes.

28. El horario de trabajo en "GG Welding Shop" es flexible, pueden trabajar de día o de noche, dependiendo de las tareas del trabajo que se asigne.

29. Las funciones de trabajo de Fernando en "GG Welding Shop" eran asistir a los empleados del taller a cortar, doblar, aguantar y darle forma a las piezas de Stainless Steel que se fabricaban. Declaró el testigo, Iván González Ruiz, que dentro de las funciones de Fernando no estaba encender motores de embarcaciones.

30. Fernando estudió hasta 4to año de escuela superior. Fernando no es mecánico, mucho menos mecánico de botes.

31. El codemandado Iván González Pizarro no era compañero de trabajo de Fernando.

32. El codemandado Iván González Pizarro no era empleado de su hijo, Iván González Ruiz, en "GG Welding Shop".

33. El codemandado Iván González Pizarro no es mecánico, ni mecánico de botes.

34. El codemandado Iván González Pizarro está retirado y para la fecha de los hechos, 2 de abril de 2018, estaba retirado. En ocasiones ayuda a su hijo en el negocio, por ejemplo, buscando cheques, ir al correo y ayudar a los empleados.

35. El 2 de abril de 2018, en horas de la mañana, el jefe de Fernando, el Sr. Iván González Ruiz, le dio instrucciones para fabricar unas piezas en Stainless Steel que se utilizan para preparar huevos para los Burger King.

36. El 2 de abril de 2018, en horas de la tarde, Fernando había terminado con las piezas que su jefe le había dicho que fabricara.

37. Surge de la prueba testifical desfilada que el Sr. Iván González Ruiz no estaba en el taller en horas de la tarde. Declaró durante el juicio que a la 1:00 p.m. salió del taller y entre las 5:00 – 5:30 pm estaba llegando al taller cuando recibió la llamada de su padre, el demandado Iván González Pizarro, para decirle que el bote se estaba quemando.

38. Surge de la prueba documental y testifical presentadas que el área de la cocina del bote era pequeña y sus medidas eran 24" x 24" x 40". En el juicio, la parte demandante demostró (utilizando una cinta métrica que le entregó al codemandado Iván González Pizarro con esas medidas) que el codemandado Iván González Pizarro no necesita ayuda, ni tiene inconvenientes para aguantar la cinta métrica en 24 [o] 40 pulgadas.

39. El codemandado Iván González Pizarro no necesitaba ayuda para tomar las medidas del "counter" de la cocina de su bote.

40. Surge de la prueba estipulada y presentada en el juicio que, en el Informe Patronal del Fondo del Seguro del Estado (Exb. 9 de la Prueba Estipulada), el Sr. Iván González Ruiz indicó que Fernando se quemó cuando estaban intentando prender un motor. En el Informe del Fondo del Seguro del Estado nada se indica con relación a la toma de unas medidas.

41. El Sr. Iván González Ruiz fue quien que *sic* hizo la notificación del incidente en el Fondo del Seguro del Estado.

42. La embarcación de los codemandados era grande, de dos pisos y tenía dos motores "in-board". Los motores de la embarcación estaban cubiertos por unas tapas o tablas las cuales el codemandado Iván González Pizarro y Fernando sacaron para poder ver los motores.

43. Declaró el testigo, Iván González Ruiz, que siempre que se va al bote hay que encender el motor para revisar el movimiento de unas poleas que están en el motor. Que el día de los hechos, había que revisar el movimiento de las poleas.

44. Fernando L. Soto Robert no estaba realizando labores de su trabajo en "GG Welding Shop" en el bote del codemandado Iván González Pizarro.

45. El motor del bote explotó cuando el codemandado Iván González Pizarro intentó encenderlo, a pesar de que Fernando le había gritado que no lo hiciera porque estaba "inundado".

46. Fernando estaba en el área de los motores cuando el codemandado Iván González Pizarro estaba prendiendo los mismos.

47. El demandado Iván González Pizarro ejercía el control y dominio de la operación que llevaba a cabo el 2 de abril de 2018 en su bote, cuando intentaba encender los motores del bote para verificar el movimiento de unas poleas.

48. El bote de los codemandados llevaba desde el 19 de septiembre de 2017 en la guardería, fuera del agua. Durante esos siete meses, el codemandado Iván González Pizarro no llevó a un mecánico y/o un mecánico de botes para que verificara los motores del bote, sólo iba a prenderlo, fumigarlo y limpiarlo. El bote no estaba asegurado.

49. Surge de la prueba estipulada y presentada en el juicio que el bote se incendió porque uno de los motores explotó, a pesar de que Fernando le había advertido al codemandado Iván González Pizarro que el motor estaba inundado (Exhibit 7 de la Prueba Estipulada – Informe de Incendio, Bomberos de Puerto Rico).

50. El día 2 de abril de 2018, el demandante Fernando L. Soto Robert se encontraba en el bote del demandado Iván González Pizarro por invitación suya.

51. La presencia del demandante Fernando L. Soto Robert el día 2 de abril de 2018 en el bote propiedad del demandado Iván González Pizarro, que estaba en una guardería en Salinas, y las tareas que realizaba Fernando al momento de ocurrir la explosión del bote no estaban intrínsecamente relacionadas con su trabajo o servicios para Iván González Ruiz en "GG Welding Shop".

52. Las tareas que realizaba el demandante Fernando L. Soto Robert el 2 de abril de 2018, en el bote del demandado Iván González Pizarro, no eran para el beneficio de su patrono.

53. En este caso, no aplica la doctrina de inmunidad patronal alegada por la parte demandada.

54. Según el testimonio de los demandantes, Fernando L. Soto Robert recibió quemaduras en la cara, cuello, brazo izquierdo y espalda. Así lo demuestran, también, las fotos presentadas en el juicio (Exhibit 6 de la Prueba Estipulada).

55. Surge del expediente médico (Exhibit 5 de la Prueba Estipulada), que el demandante Fernando sufrió quemaduras de segundo grado, en un 13% del total de la superficie de la piel, específicamente en la cabeza, cara (lado izquierdo), cuello, brazo izquierdo y espalda baja. Declararon los demandantes que las heridas de Fernando estaban en "carne viva".

56. Cuando se quemó, el demandante Fernando declaró que sentía un ardor en su cuerpo y que respiraba sangre.

57. El demandante Fernando manejó su vehículo desde Salinas hasta el Hospital de Cayey. El demandado Iván González Pizarro no le ofreció llevarlo al hospital ni procuró ayuda para Fernando, se quedó atendiendo el fuego del bote.

58. Para el 2 de abril de 2018, Fernando tenía una pick-up, Toyota Tacoma del 2017.

59. El día 2 de abril de 2018, el demandante, Fernando L. Soto Robert, fue atendido en el Hospital Menonita de Cayey y fue trasladado en ambulancia al Centro Médico de Río Piedras, donde estuvo hospitalizado de 8 a 9 días.

60. En el Hospital Menonita de Cayey, le dieron los primeros auxilios al demandante Fernando y le vendaron los brazos, cara y cuello. Ordenaron su traslado para la unidad de quemados del Centro Médico. Durante el traslado en ambulancia, Fernando sentía que se iba a morir.

61. El demandante Fernando L. Soto Robert estuvo hospitalizado en el Centro Médico – Hospital Universitario de Adultos en Río Piedras, Puerto Rico. Así surge del récord médico presentado en evidencia (Exhibit 5 de la Prueba Estipulada).

62. El proceso de curación de las quemaduras de Fernando era sumamente doloroso y se lo hicieron todos los días que estuvo hospitalizado en Centro Médico. Declaró la parte demandante que, cuando lo curaban, lo raspaban en esas partes hasta quedar en "carne viva".

63. El proceso de curación de las quemaduras de Fernando consistía en raspar las quemaduras hasta botar sangre en "carne viva", le aplicaban crema y vendaje. Mientras le hacían la curación no le daban medicamentos para el dolor; le administraban morfina después que terminaban el proceso.

64. Luego de ser dado de alta, Fernando estuvo 1 mes sin poder salir de su casa.

65. En el Centro Médico le ordenaron a Fernando que no podía exponerse al sol por 1 año.

66. Fernando perdió su trabajo por consecuencia de las quemaduras recibidas y no pudo trabajar por 1 año.

67. El demandante Fernando perdió su vehículo de motor porque no tenía ingresos para pagarlo y tuvo que hacer entrega voluntaria del mismo.

68. Como consecuencia de la explosión, Fernando sufrió y continúa sufriendo serias angustias mentales. Sufre de ansiedad y depresión; no puede socializar con otras personas, su carácter cambió, si escucha ruidos altos se pone nervioso, el olor a gasolina le recuerda la explosión, no puede dormir bien, sufre de

depresión y ansiedad y toma medicamentos para poder estar tranquilo.

69. El demandante Cristóbal Soto Robert sufrió y continúa sufriendo serias angustias mentales como consecuencia de que su hermano Fernando lo llamó para informarle que había tenido un accidente; al ver a su hermano llegar al Hospital de Cayey; al ver a su hermano en camilla para ser trasladado en ambulancia; al ver a su hermano hospitalizado en Centro Médico; al ver a su hermano en el proceso de curación; al ver a su hermano gritando del dolor; al tener que ayudar y asistir a su hermano mientras estuvo hospitalizado y durante el tiempo que estuvo recuperando en su casa; al ver a su hermano sufrir y que no sea el mismo de antes de la explosión.

70. La demandante Wanda Robert Colón sufrió y continúa sufriendo serias angustias mentales al ver a su hijo Fernando todos los días que estuvo hospitalizado por las quemaduras que sufrió; al ver a su hijo pasar por el proceso de curación; al ver a su hijo sufriendo de dolor intenso; al tener que curar las quemaduras de su hijo luego de ser dado de alta; al ver a su hijo deprimido y su cambio de personalidad por consecuencia de la explosión; al tener que dejar de cuidar a su esposo para estar en el hospital con su hijo.

71. El demandante Leonardo Soto Santos sufrió y continúa sufriendo serias angustias mentales al ver a su hijo Fernando quejándose del dolor por las quemaduras y la curación; al ver a su esposa llorando porque su hijo estaba pasando dolor; al no poder estar bajo el cuidado de su esposa porque ella estaba en el hospital con su hijo.

72. Mientras Fernando estuvo hospitalizado y durante el período que no pudo trabajar, sus padres le compraban las medicinas y cremas, así como pagaban los gastos de Fernando. El hermano de Fernando, Cristóbal, también lo ayudó económicamente.

73. Los demandantes son una familia unida. Para la fecha del accidente todos vivían en la misma residencia.

74. Las lesiones y quemaduras que recibió el demandante Fernando, como consecuencia de la explosión, se debieron única y exclusivamente a la culpa y negligencia del codemandado Iván González Pizarro, al no advertir del peligro existente y no ejercer el mayor cuidado y tomar todas las precauciones que conoce o debió conocer para evitar tal peligro.

75.  La Sociedad Legal de Gananciales que compone el Sr. Iván González Pizarro con su esposa Petronila Ruiz Velázquez es responsable solidariamente por los daños sufridos por la parte demandante.

76.  La parte demandada incurrió en temeridad en el presente caso. (Énfasis en el original omitido).[26]

En adición, las partes sometieron como prueba documental estipulada, la siguiente:

Exhibit 1 – Transcripción de Deposición del Sr. Fernando L. Soto Robert tomada el 25 de octubre de 2019.

Exhibit 2 – Transcripción de Deposición del Sr. Iván González Pizarro tomada el 14 de mayo de 2021.

Exhibit 3 – Transcripción de Deposición del Sr. Iván González Ruiz tomada el 14 de mayo de 2021.

Exhibit 4 – Copia de Expediente Médico – Hospital Menonita, Cayey – Récord médico de Fernando Soto Robert.

Exhibit 5 – Copia de Expediente Médico – Centro Médico Río Piedras – Récord médico de Fernando Soto Robert.

Exhibit 6 – Fotos de quemaduras y heridas – Fotos de lesiones físicas y quemaduras recibidas por Fernando Soto Robert.

Exhibit 7 – Informe de Incendio, Bomberos de Puerto Rico – Informe del Departamento de Bomberos de Puerto Rico sobre incendio atendido el 2/abril/2018 en Marina de Salinas.

Exhibit 8 – Isla Repossessions & Collections, Inc. – Informe de Condición – Informe de Condición por Entrega o Depósito de Vehículo.

Exhibit 9 – Informe Patronal de la Corporación del Fondo del Seguro del Estado [(CFSE)] firmado por el Sr. Iván González Ruiz, fechado el 17 de abril de 2018.

Exhibit 10 – Certificación de Póliza expedida por la CFSE con fecha de 23 de abril de 2019 y firmado por el Oficial Ejecutivo de Área de Seguros, Rey F. Santana Pereles.

Exhibit 11 – Decisión del Administrador sobre Tratamiento Médico firmado por Ermelinda Vázquez Pérez, fechado el 25 de junio de 2018.

---

[26] *Íd.*, págs. 11-16.

        Exhibit 12 - Decisión de Cierre por Falta de Interés en Casos donde se Recibe por Correo el Informe Patronal, firmado por Beverly Rivera Haddock y Lizette Alejandro Peña, fechado el 20 de junio de 2018.[27]

A tenor con lo anterior, el Tribunal de Primera Instancia resolvió que, el accidente sufrido por el señor Soto Robert no estuvo relacionado a las funciones de su trabajo y que no se encontraba realizando funciones vinculadas a su trabajo, por lo que no aplicaba la doctrina de inmunidad patronal. El tribunal apelado razonó que, el accidente se debió a la culpa y negligencia del señor González Pizarro, "al no darle mantenimiento adecuado a su bote y no asegurarse de tomar las debidas precauciones al momento de intentar prender los motores de este."[28]

De otro lado, el foro de instancia llevó a cabo el proceso de valorización de daños, y determinó que a los apelados le correspondían las siguientes sumas en concepto de compensación:

1. Por los daños físicos, emocionales y angustias mentales del Sr. Fernando L. Soto Robert, la suma de $138,947.37.

2. Por el lucro cesante pretérito del Sr. Fernando L. Soto Robert, la suma de $18,815.79.

3. Por los daños emocionales y angustias mentales psicológicos sufridos por los co-demandantes Leonardo Soto Santos y Wanda Robert Colón, la suma de $30,526.32 cada uno.

4. Por los daños emocionales y angustias mentales sufridos por el co-demandantes Cristóbal Soto Robert, la suma de $6,105.26.[29]

En adición, impuso una partida de $3,000.00 a favor de los apelados, en concepto de honorarios de abogado por temeridad, sujetas al interés legal de un 8%, hasta el cumplimiento del pago.

En desacuerdo con el dictamen, el 19 de abril de 2023, los apelantes presentaron *Urgente Moción de Reconsideración; Moción*

---

[27] *Íd.*, págs. 16-17.
[28] *Íd.*, pág. 26.
[29] *Íd.*, pág. 27.

*de Enmiendas o Determinaciones Iniciales o Adicionales.*[30] A grandes rasgos, sostuvieron que el tribunal de instancia no atendió varios asuntos, entre los cuales destacó los siguientes: (i) que el señor Soto Robert se encontraba en horas laborables al momento del accidente, y llevando a cabo funciones relacionadas a su empleo; (ii) que existía una relación obrero patronal entre el señor González Pizarro y el señor Iván González Ruiz; (iii) que los apelados no probaron el nexo causal y la negligencia imputada a los apelantes y, (iv) que no se presentaron peritos para el elemento de negligencia, los daños físicos, el nexo causal y los daños económicos. En adición, solicitaron la enmienda de doce (12) de las determinaciones de hechos consignadas en la *Sentencia Final.* Finalmente, insistieron una vez más en que eran de aplicación las doctrinas de inmunidad patronal y de agotamiento de remedios.

El 9 de mayo de 2023, el apelado presentó *Oposición a "Urgente Moción de Reconsideración; Moción de Enmiendas o Determinaciones Iniciales o Adicionales"*, solicitando que la referida reconsideración se declarase sin lugar.[31]

Atendidos los escritos, el 21 de junio de 2023, y notificada al próximo día, el tribunal *a quo* dictó la *Resolución* recurrida, denegando la reconsideración presentada por los apelantes, así como su solicitud de determinaciones adicionales.[32]

Insatisfechos aún, los apelantes comparecieron el 24 de julio de 2023 ante este foro apelativo, mediante el recurso de apelación que nos ocupa, y realizaron los siguientes señalamientos de error:

A. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SALINAS, AL DETERMINAR QUE NO APLICA LA INMUNIDAD PATRONAL POR RAZÓN DE QUE EL DEMANDANTE NO SE ENCONTRABA EN HORAS LABORABLES, NI SE ENCONTRABA REALIZANDO FUNCIONES INHERENTES A SU TRABAJO.

---

[30] *Íd.*, págs. 94-140.
[31] *Íd.*, págs. 141-142.
[32] *Íd.*, págs. 1-9.

B. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SALINAS, AL ESTABLECER QUE LAS DETERMINACIONES DE HECHOS ENUMERADAS EN LA SENTENCIA ESTUVIERON CORRECTAS, CUANDO LAS MISMAS SE BASARON EN PRUEBA TESTIFICAL OBJETADA OPORTUNAMENTE, ABUSANDO DE SU DISCRECIÓN EN LA APRECIACIÓN DE LA PRUEBA.

C. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SALINAS, AL CONCLUIR QUE HUBO NEGLIGENCIA, BASÁNDOSE EN UNA PRUEBA TESTIFICAL QUE FUE OBJETADA OPORTUNAMENTE POR FALTA DE *EXPERTISE* DEL DECLARANTE.

D. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SALINAS, AL IMPUTAR NEGLIGENCIA AL DEMANDADO Y CONCLUIR QUE LA MISMA FUE LA CAUSA PRÓXIMA DEL ACCIDENTE, DETERMINANDO CON ESTO RESPONSABILIDAD DEL DEMANDADO FRENTE A LA PARTE DEMANDANTE, CUANDO LA PARTE DEMANDANTE CARECÍA DE PRUEBA QUE ESTABLECIERA LA ALEGADA NEGLIGENCIA, INCURRIENDO EN CLARO ABUSO DE SU DISCRECIÓN.

E. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SALINAS, AL CONCLUIR QUE EL CÁLCULO REALIZADO PARA DETERMINAR LA CUANTÍA POR LA PARTIDA DE LUCRO CESANTE FUE UNO RAZONABLE, NO RESTANDO LAS SUMAS RECIBIDAS POR EL DEMANDANTE LUEGO DEL ACCIDENTE, INCURRIENDO CON ESTO EN ABUSO DE DISCRECIÓN.

Luego de múltiples trámites procesales, el 21 de noviembre de 2023, los apelantes presentaron la Transcripción de la Prueba Oral del Juicio en su Fondo. Posteriormente, el 8 de febrero de 2024, instaron su *Alegato Suplementario*. Luego, el 8 de marzo de 2024, los apelados presentaron su *Alegato en Oposición*.

Perfeccionado el recurso, y con el beneficio de la comparecencia de las partes, resolvemos.

## II

### A. *Deferencia Judicial*

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de

gran deferencia por parte de los foros apelativos, puesto que, el juzgador de instancia es quien –de ordinario– se encuentra en mejor posición para aquilatar la prueba testifical. *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-771 (2013); *Hernández Maldonado v. Taco Maker*, 181 DPR 281, 289 (2011); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 177 DPR 345, 356 (2009). Bajo este supuesto, los foros de primera instancia tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Meléndez Vega v. El Vocero de PR*, 189 DPR 123, 142 (2013).

No obstante, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos no debemos intervenir con las determinaciones ni las adjudicaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, supra; *Santiago Ortiz v. Real Legacy et al.*, supra; *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 490 (2016); *Dávila Nieves v. Meléndez Marín*, supra, pág. 753; *Rodríguez et al. v. Hospital et al.*, 186 DPR 889, 908-909 (2012); *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, supra.

Como sabemos, "[l]a tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Sin embargo, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad." *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 434-435 (2013). Véase, además, *Pueblo v. Rivera Montalvo*, 205 DPR 352, 373 (2020); *Umpierre Matos v. Juelle Abello*, 203 DPR 254, 275 (2019), citando a *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000). Es por lo

que, nuestra más Alta Curia ha definido la *discreción* como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera." *Rivera Gómez v. Arcos Dorados Puerto Rico*, Inc., 2023 TSPR 65, *Pueblo v. Rivera Montalvo*, supra, citando a *Citibank et al. v. ACBI et al.*, 200 DPR 724, 735 (2018); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 729 (2016); *SLG Zapata-Rivera v. J.F. Montalvo*, supra, pág. 435, citando a *IG Builders et al. v. BBVAPR*, 185 DPR 307, 338 (2012); *Pueblo v. Rivera Santiago*, 176 DPR 559, 580 (2009). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna." *Citibank et al. v. ACBI et al.*, supra, citando a *SLG Zapata-Rivera v. J.F. Montalvo*, supra; *Hietel v. PRTC*, 182 DPR 451, 459 (2011); *Santa Aponte v. Srio. del Senado*, 105 DPR 750, 770 (1977). Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho." *SLG Zapata-Rivera v. J.F. Montalvo*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 DPR 651, 658 (1997); *Hietel v. PRTC*, supra, citando a *Bco. Popular de P.R. v. Mun. de Aguadilla*, supra.

### B. Responsabilidad Civil Extracontractual

Como sabemos, en nuestro ordenamiento jurídico, la responsabilidad civil extracontractual emana del Artículo 1802 del Código Civil -aplicable al caso de autos- que, a tales efectos, dispone que "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". 31 LPRA ant. sec. 5141.[33] *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, 2023 TSPR 108, 212 DPR ___ (2023); *Cruz Flores et al. v. Hosp. Ryder et al.*, 210 DPR 465, 483 (2022); *Colón Santos v. Coop. Seg. Mult. P.R.*

---

[33] El derecho aplicable en el caso de epígrafe se remite al Código Civil de Puerto Rico de 1930, puesto que, la presentación de la *Demanda* y los hechos que dan base a esta tuvieron lugar antes de la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

173 DPR 170,177 (2008). Para que prospere una reclamación por daños y perjuicios al amparo del referido precepto legal, se requiere la concurrencia de tres elementos, los cuales tienen que ser probados por la parte demandante: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra; *Cruz Flores v. Hosp. Ryder et al*, supra; *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

El daño constituye el menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra persona. En nuestro ordenamiento jurídico se reconoce la existencia de dos tipos de daños: los especiales, conocidos como daños físicos, patrimoniales, pecuniarios o económicos, y los generales, conocidos como daños morales. *Nieves Díaz v. González Massas*, supra.

La culpa o negligencia es falta del debido cuidado, esto es, no anticipar ni prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en tales circunstancias. *Sucn. Mena Pamias et. al. v. Meléndez et. al.*, supra; *Montalvo v. Cruz*, 144 DPR 748, 755 (1998).

Cónsono con lo anterior, a través de la jurisprudencia observamos que un elemento esencial de la responsabilidad civil extracontractual es el factor de la previsibilidad. El deber de previsión no se extiende a todo riesgo posible, pues, es necesario examinar si un daño pudo ser el resultado natural y probable de un acto negligente. *Cruz Flores v. Hosp. Ryder et al*, supra. Para determinar si el resultado era razonablemente previsible, es preciso acudir a la figura del hombre prudente y razonable, también conocida como el buen padre de familia, que es aquella persona que

actúa con el grado de cuidado, diligencia, vigilancia y precaución que exigen las circunstancias. *Nieves Díaz v. González Massas,* supra, pág. 844. Si el daño es previsible por éste, hay responsabilidad; sino es previsible, estamos generalmente en presencia de un caso fortuito. *Montalvo v. Cruz,* supra, pág. 756.

El deber de cuidado incluye, tanto la obligación de anticipar, como la de evitar la ocurrencia de daños, cuya probabilidad es razonablemente previsible. El deber de anticipar y prever los daños no se extiende a todo riesgo posible. *Íd.* Lo esencial en estos casos es que se tenga el deber de prever en forma general consecuencias de determinada clase. Sobre este particular, el Tribunal Supremo de Puerto Rico, ha sido enfático al expresar que sin la existencia de este "deber de cuidado mayor" no puede responsabilizarse a una persona porque no haya realizado el acto de que se trate. *Hernández v. Televicentro,* 168 DPR 803, 813-814 (2006).

Ahora bien, el elemento de la previsibilidad se halla íntimamente relacionado al segundo requisito: el nexo causal. En Puerto Rico rige la teoría de la causalidad adecuada, la cual postula que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". *Cruz Flores v. Hosp. Ryder et al,* supra. En *Rivera v. S.L.G. Díaz,* 165 DPR 408, 422 (2005), nuestro más Alto Foro señaló que la relación causal, elemento imprescindible en una reclamación en daños y perjuicios, es un elemento del acto ilícito que vincula al daño directamente con el hecho antijurídico. *Nieves Díaz v. González Massas,* supra, págs. 844-845. Conforme con lo anterior, un daño podrá ser considerado como el resultado probable y natural de un acto u omisión negligente si luego del suceso, mirándolo retroactivamente, éste parece ser la consecuencia razonable y común de la acción u omisión de que se trate.

*Hernández v. Televicentro*, supra*, pág. 814; *Cruz Flores v. Hosp. Ryder et al*, supra.

Para establecer la relación causal necesaria, no es suficiente que un hecho aparente ser condición de un evento, si éste regularmente no trae aparejado ese resultado. Esta normativa ha sido fundamentalmente desarrollada con el propósito de limitar la responsabilidad civil a aquellos casos en que la ocurrencia de un hecho dañoso sea imputable moralmente a su alegado autor, porque éste era una consecuencia previsible o voluntaria del acto negligente. *Soto Cabral v. E.L.A.*, 138 DPR 298, 317 (1995).

Al aplicar el principio de la causalidad adecuada, el Tribunal Supremo de Puerto Rico expresó lo siguiente:

> La difícil determinación de cuándo existe nexo causal entre el daño producido por un acto delictivo de un tercero y la omisión de cumplir con la obligación de tomar precauciones, medidas de seguridad y protección, no puede 'resolverse nunca de una manera plenamente satisfactoria mediante reglas abstractas, sino que en los casos de duda ha de resolverse por el juez según su libre convicción, ponderando todas las circunstancias'." *J.A.D.M. v. Centro Comercial de Plaza Carolina*, 132 DPR 785, 796 (1993).

## C. *Ley del Sistema de Compensaciones por Accidentes en el Trabajo*

Mediante la aprobación de la Ley del Sistema de Compensaciones por Accidentes en el Trabajo, Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 LPRA sec. 1 *et seq.*, se crearon el Fondo del Seguro del Estado y la Comisión Industrial de Puerto Rico, con el propósito de asegurar al trabajador empleado una compensación justa y rápida por los daños sufridos a consecuencia de accidentes o enfermedades acaecidas en el desempeño de su trabajo. *González v. Multiventas*, 165 DPR 873, 880-881 (2005); *Guzmán y otros v. ELA*, 156 DPR 693, 727 (2002). La aprobación de esta legislación surgió como resultado de mutuas concesiones entre los obreros, cuya fuerza era limitada, y los patronos quienes enfrentaban una intensa presión de parte de sus

obreros. *González v. Multiventas, supra*, pág. 881. La referida ley estableció un esquema de aportación patronal compulsoria a un fondo estatal de seguro, con el fin de compensar lesiones que provengan de cualquier acto o función del obrero, **siempre que sean inherentes a su trabajo**, **o que ocurran en el curso de éste**. *González v. Multiventas*, supra; *Martínez Rodríguez v. Bristol Myers, Inc.*, 147 DPR 383, 393 (1999); *Odriozola v. Superior Cosmetic Distributors Corp.*, 116 DPR 485, 499 (1985).

Conforme al esquema de la CFSE, el patrono asume el riesgo de la lesión, entendiéndose que su responsabilidad es absoluta. *González v. Multiventas*, supra. Siendo así, el empleado que se acoge a la CFSE por un accidente del trabajo no tendrá que probar que hubo negligencia de parte del patrono como causa de la lesión o enfermedad, por lo que es inmaterial que el accidente haya ocurrido a consecuencia de la negligencia del patrono, de un tercero, o hasta del propio empleado. *Íd.*; *Guzmán y otros v. ELA,* supra, pág. 729. Es decir, el empleado recibe compensación independientemente de quién sea responsable por el accidente. La legislación evita que el empleado tenga que enfrentar las dificultades de una reclamación civil ante los tribunales, donde tendría que probar el elemento de culpa o negligencia. *González v. Multiventas*, supra; *Guzmán y otros v. ELA,* supra, pág. 730. A cambio de esta protección, el patrono asegurado recibe inmunidad contra cualquier reclamación civil en daños y perjuicios que pueda entablar el empleado lesionado en su contra. *González v. Multiventas*, supra, págs. 881-882; *Guzmán y otros v. ELA,* supra.

Por otra parte, es vasta la jurisprudencia del Tribunal Supremo de Puerto Rico que destaca el carácter absoluto de la inmunidad patronal. Ni siquiera la negligencia crasa de parte del patrono quiebra esta inmunidad, y es el remedio provisto por la CFSE el único remedio disponible para el empleado lesionado.

*González v. Multiventas*, supra, pág. 882; *Guzmán y otros v. ELA.*, supra; *Hernández Sánchez v. Bermúdez & Longo, S.E.*, 149 DPR 543, 549 (1999); *Admor., FSE v. Flores Hnos. Cement Prods., Inc.*, 107 DPR 789, 796 (1978). No obstante, por excepción, la inmunidad patronal no aplica en aquellas situaciones en las que el daño sufrido por el obrero se deba a un acto intencional o discriminatorio de parte del patrono. Ante este tipo de actuación del patrono, se le reconoce al empleado afectado una causa de acción para reclamarle civilmente a su patrono. (Citas omitidas). *González v. Multiventas*, supra, págs. 882-883.

De otra parte, nuestro más Alto Foro ha expresado en reiteradas ocasiones que para que el patrono pueda levantar la defensa de inmunidad exitosamente, tiene que existir un nexo causal entre el accidente y el empleo. *López Cotto v. Western Auto*, 171 DPR 185, 195 (2007). Más específicamente, un accidente es compensable bajo las disposiciones de la ley antedicha, cuando: (a) provenga de cualquier acto o función del obrero; (b) **sea inherente al trabajo o empleo del obrero**, y (c) ocurra en el curso de éste. El requisito de que el accidente ocurra como consecuencia de ejecutar una función inherente al empleo significa que la lesión ocurra mientras el empleado u obrero realiza las **labores normales** de su puesto. (Citas omitidas). *Íd.*

### D. Lucro Cesante

Nuestro Tribunal Supremo ha definido lucro cesante como aquella partida de daño que debe ser resarcida por la pérdida de ingresos infligida al perjudicado y la correspondiente disminución de su capacidad productiva. *PRFS v. Promoexport*, 187 DPR 42, 61 (2012); *S.L.G. Rodríguez v. Nationwide*, 156 DPR 614, 623 (2002). Se trata de una ganancia futura que con cierta probabilidad se esperaba, pero no llega a ser obtenida. *PRFS v. Promoexport*, supra; *Ruiz Santiago v. ELA*, 116 DPR 306, 313 (1985).

Como elemento del daño, la persona que reclame una indemnización por lucro cesante, debe demostrar que la interrupción y el cese de sus ingresos fue provocado por las actuaciones de la parte demandada. *S.L.G. Rodríguez v. Nationwide*, supra, págs. 623-624.

Al estimar y valorizar la partida de lucro cesante, permea esencialmente un elemento de razonabilidad. *Íd.*, pág. 625. Ecuaciones matemáticas utilizadas en decisiones previas no suponen una fórmula determinada y estricta que deba aplicarse en toda determinación de lucro cesante. *Íd.* Lo fundamental es que el motivo utilizado para llevar a cabo los cómputos sea razonable, en aras de una determinación prudente. *Íd.*

Cónsono a lo anterior, se ha resuelto que los tribunales apelativos deben guardar deferencia a las valorizaciones de daños realizadas por los foros de primera instancia, puesto que son éstos quienes tienen contacto directo con la prueba testifical y quedan en mejor posición para emitir un juicio. *Rodríguez et al. v. Hospital et al.*, supra, pág. 909; *Herrera Rivera v. S.L.G. Ramírez-Vincéns*, 179 DPR 774, 785 (2010).

Ahora bien, no intervendremos con las estimaciones de daños que los tribunales de instancia realicen, salvo cuando la cuantía concedida advenga ridículamente baja o exageradamente alta. La valoración de los daños está sujeta a un cierto grado de especulación y conlleva elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos. *Íd*; *Cruz Flores v. Hosp. Ryder Mem'l Inc.*, supra.

**III**

En su comparecencia ante esta Curia, los apelantes arguyen que, el Tribunal de Primera Instancia incidió al declarar Sin Lugar su *Moción de Reconsideración; Moción de Enmiendas o Determinaciones Iniciales o Adicionales.* En lo específico, sostienen

que el foro primario erró: (1) al determinar que no aplica la doctrina de inmunidad patronal; (2) al establecer que las determinaciones de hechos consignadas en la *Sentencia* emitida el 4 de abril de 2023 estuvieron correctas, puesto que se basaban en prueba testifical objetada oportunamente; (3) al concluir que hubo negligencia; (4) al imputar negligencia al señor González Pizarro y concluir que la misma fue causa próxima del accidente, y (5) al concluir que el cálculo realizado para determinar la cuantía por lucro cesante fue razonable, sin haber restado las sumas recibidas por el señor Soto Robert luego del accidente.

Tras un minucioso análisis del expediente ante nuestra consideración, así como de la Transcripción de la Prueba Oral del Juicio en su Fondo y de la jurisprudencia aplicable, razonamos que no les asiste la razón. Veamos.

En su señalamiento de **error A**, los apelantes nos plantean que el Tribunal de Primera Instancia incidió al determinar que en el caso de marras no aplica la doctrina de inmunidad patronal. Aducen que, el accidente sufrido por el señor Soto Robert ocurrió dentro de sus horas laborables y como parte de las funciones inherentes a su empleo.

Según surge del expediente, el 2 de abril de 2018, mientras el señor González Pizarro intentaba encender los motores de su embarcación, ocurrió una explosión que provocó el incendio de esta. Como consecuencia de ello, el señor Soto Robert sufrió quemaduras en varias partes de su cuerpo. Al momento de dichos hechos, el señor Soto Robert laboraba en G&G Welding Shop. Según testificado por el señor Iván González Ruiz, dicha compañía se dedicaba a lo siguiente: "[h]acemos tanques para diésel, les damos mantenimiento a las plantas eléctricas en algún momento y hacemos trabajos de 'stainless steel'. Hacemos (ininteligible) para los Burger King y

distintas compañías."[34] Allí, el señor Soto Robert se desempeñaba como ayudante. En detalle, el señor Soto Robert testificó que era "ayudante para fabricar piezas en 'stainless steel'.[35] De igual manera, el señor Iván González Ruiz testificó que el señor Soto Robert asistía a otros empleados, en funciones como las siguientes: "si estaban doblando y había que hacer (ininteligible) lo ayudaba. Ayudaba a medir en el caso de una situación. Iba con la persona que yo asignaba a hacer el trabajo y él era el ayudante."[36]

De lo anterior, surge con meridiana claridad que, los actos que el señor Soto Robert realizaba al momento del accidente, de ninguna manera eran funciones normales del puesto que ocupaba en G&G Welding Shop. Esto es, el acto de verificar los motores de la embarcación del señor González Pizarro, no era parte de las funciones ordinarias que el señor Soto Robert llevaba a cabo en su empleo.

Conforme expusiéramos, para que un patrono asegurado - bajo la Ley del Sistema de Compensaciones por Accidentes en el Trabajo- reciba inmunidad patronal, deben darse tres supuestos en conjuntos, a saber: (a) que el accidente provenga de cualquier acto o función del obrero; (b) **sea inherente al trabajo o empleo del obrero**, y (c) ocurra en el curso de éste. El requisito de que el accidente ocurra como consecuencia de ejecutar una función inherente al empleo significa que **la lesión ocurra mientras el empleado u obrero realiza las labores normales de su puesto**. (Citas omitidas). *López Cotto v. Western Auto*, supra.

Al igual que concluyó el tribunal *a quo*, somos del criterio que la labor que llevaba a cabo el señor Soto Robert al momento del accidente no estaba intrínsecamente relacionada al empleo ni a las

---

[34] Transcripción de la prueba oral, del 21 de febrero de 2023, pág. 95, líneas 4-9.
[35] Transcripción de la prueba oral, del 24 de enero de 2023, pág. 30, línea 25 y pág. 31, líneas 1-3.
[36] Transcripción de la prueba oral, del 21 de febrero de 2023, pág. 99, líneas 5-13.

labores que realizaba en G&G Welding Shop. Cónsono a ello, no cabe hablar de la doctrina de inmunidad patronal en el presente caso, puesto que la misma no es de aplicación. Así pues, concluimos que el **error A** no se cometió.

Por estar relacionados, discutiremos los señalamientos de **error B** y **C** en conjunto. En esencia, los apelantes arguyen que, el foro primario incidió al concluir que las determinaciones de hechos enumeradas en la sentencia estuvieron correctas, y al determinar que hubo negligencia, aun cuando ello se basó en prueba testifical que fue objetada oportunamente.

De un examen minucioso de la Transcripción de la Prueba Oral del Juicio en su Fondo, concluimos que los apelantes no lograron derrotar la presunción de corrección que merecen las determinaciones de hechos consignadas por el foro apelado. Es decir, del expediente ante nos, no surge prueba alguna que nos permita descartar las determinaciones del foro de instancia. Tanto las determinaciones de hechos como las conclusiones de derecho del foro de instancia estuvieron basadas en la prueba documental y testifical que dicho foro tuvo ante su consideración y de conformidad al derecho aplicable. Debemos recordar que, el tribunal *a quo* es el que se encuentra en mejor posición para aquilatar la prueba, toda vez que, son los Tribunales de Instancias quienes tienen la oportunidad de oír, ver y apreciar el comportamiento de los testigos.[37] Es por dicha razón, que las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de esta segunda instancia judicial.[38] Insistimos en que, del expediente ante nos, no surge prueba alguna

---

[37] Véase, *Pueblo v. Hernández Doble*, supra, pág. 864; *Santiago Ortiz v. Real Legacy et al.*, supra, pág. 219; *Dávila Nieves v. Meléndez Marín*, supra, pág. 770-771; *Meléndez Vega v. El Vocero de PR*, supra, pág. 142; *Hernández Maldonado v. Taco Maker*, supra, pág. 289; *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico*, supra, pág. 356.
[38] *Íd.*

que nos permita descartar las determinaciones del foro de instancia. En adición, reiteramos que los apelantes no lograron derrotar la presunción de corrección que merecen las determinaciones del foro recurrido. Por lo tanto, reconociendo la deferencia que el tribunal *a quo* se merece, debemos sostener sus determinaciones. Máxime, cuando no encontramos en las actuaciones de dicho foro la existencia de pasión, prejuicio, parcialidad o error manifiesto. Así pues, los **errores B** y **C** tampoco se cometieron.

En su señalamiento de **error D**, los apelados esgrimen que el foro de instancia se equivocó al imputar negligencia al señor González Pizarro y, determinar que dicha negligencia fue la causa próxima del accidente. Puntualizan que, el tribunal *a quo* no debió considerar la alegación de que el motor de la embarcación estaba inundado, puesto que el señor Soto Robert carece de *expertise* para testificar sobre asunto alguno de mecánica. Añaden que, ello fue objetado oportunamente y declarado con lugar. No le asiste la razón.

En primer lugar, un análisis detallado de la Transcripción de la Prueba Oral del Juicio en su Fondo, muestra que, si bien el señor Soto Robert declaró en dos ocasiones haberle expresado al señor González Pizarro que el motor de la embarcación estaba inundado[39], ello no fue objetado en ninguna de las instancias. Sin embargo, en ninguna de las dos ocasiones las partes objetaron dicha declaración.

En segundo lugar, razonamos correcto lo consignado por el Tribunal de Primera Instancia en la *Resolución* recurrida, en cuanto a que el señor González Pizarro no tomó las precauciones necesarias para evitar el accidente que le ocasionó las quemaduras al señor Soto Robert. Así como tampoco se aseguró de que el señor Soto Robert tuviese el conocimiento y la destreza para llevar a cabo la

---

[39] Transcripción de la Prueba Oral, del 24 de enero de 2023, pág. 37, líneas 14-17, y pág. 38, líneas 4-7.

actividad que realizaba al momento de los hechos. Coincidimos pues, en que la negligencia del señor González Pizarro "fue la causa próxima del accidente y por lo tanto, es responsable por los daños causados" a los apelados.[40]

Finalmente, en su señalamiento de **error E**, los apelados sostienen que el tribunal primario erró al concluir que la partida de lucro cesante fue correcta, sin haber restado las sumas recibidas por el señor Soto Robert luego de haber sufrido el accidente. No nos persuade.

Como dijéramos, al estimar y valorizar la partida de lucro cesante, el Tribunal debe guiarse por el criterio de razonabilidad.[41] Examinado el expediente ante nos, y de acuerdo a dicha norma doctrinal, razonamos correcta la determinación del Tribunal de Primera Instancia. Esto es, nos parece acertada y razonable la partida concedida por el foro *a quo* al señor Soto Robert, por concepto de lucro cesante.

De conformidad a todo lo anterior, no encontramos base jurídica racional para arribar a un resultado distinto al que llegó el Tribunal de Primera Instancia. En consecuencia, se confirma el dictamen apelado.

**IV**

Por los fundamentos expuestos, se confirma la *Resolución* apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[40] Apéndice del recurso de apelación, pág. 8.
[41] *S.L.G. Rodríguez v. Nationwide*, supra.